**In re ASIA GLOBAL CROSSING, LTD., et al., Debtors.**

**No. 02 B 15749(SMB).**

United States Bankruptcy Court, S.D. New York.

June 28, 2005.

Golenbock, Eiseman, Assor, Bell & Peskoe LLP, Jonathan L. Flaxer, of Counsel, New York City, for Trustee.

Willkie, Farr & Gallagher LLP, Alan J. Lipkin, Daniel C. McElhinney, of Counsel, New York City, for 360networks Corporation.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART CROSS–MOTIONS FOR SUMMARY JUDGMENT

STUART M. BERNSTEIN, Chief Judge.

360networks Corporation ("360networks") filed a $100 million proof of claim against the estate of Asia Global Crossing, Ltd. ("Asia Global"). The claim is based on a guaranty of certain obligations of Global Crossing Bandwidth, Inc. ("GC Bandwidth") to 360networks. Robert L. Geltzer, Esq., the trustee of Asia Global's estate, filed an objection that the parties agreed to treat as a motion for summary judgment on a limited issue. 360networks also cross-moved for summary judgment on the same issue.

For the reasons that follow, the trustee's motion is denied, and the cross-motion is granted to the extent of determining that an anticipatory repudiation by Asia Global occurred on January 29, 2003, but not before then. 360networks must still demonstrate, however, that it was ready, willing and able to perform its obligations under the various contracts discussed below.

### BACKGROUND

At all relevant times prior to the November 17, 2002 petition date, Asia Global was a pan-Asian telecommunications carrier. It provided bandwidth and value-added data services to customers through a telecommunications network that spanned Asia, with connections to the United States. (*Chapter 7 Trustee's Motion for Summary Judgment on Objection to Claim Number 5 of 360networks Corporation*, dated April 26, 2005 ("*Trustee's Motion*"), at ¶ 4)(ECF Doc. # 604.) Asia Global was also part of a corporate family that figures into this dispute. It was an indirect majority owned subsidiary of Global Crossing Ltd. ("Global Crossing"), (*id.*, at ¶ 5), and in turn, was the majority owner of GC Bandwidth. (*Declaration of Jonathan L. Flaxer in Support of Trustee's Motion for Summary Judgment on Objection to Claim Number 5 of 360networks Corporation*, dated April 26, 2005 ("*Flaxer Declaration*"), ·Ex. C)(ECF Doc. ##605–07.) Global Crossing and GC Bandwidth filed chapter 11 petitions in this Court on January 28, 2002.

### A. The Master Agreement

On or about March 30, 2001, GC Bandwidth on the one hand, and 360networks (Holdings) Ltd. and 360Pacific (Bermuda) Ltd. on the other, entered into an agreement (the "Master Agreement")[1] relating to the delivery of telecommunications capacity in Asia through the fiber optic cable systems owned by GC Bandwidth's affiliates Pacific Crossing Ltd. and East Asia Crossing Ltd. (the "Asia Commitment").[2] 360networks "unconditionally and irrevocably" agreed, *inter alia*, "to accept, purchase, pay for in full and receive an IRU [indefeasible right to use] on the EAC and/or PC–1 systems for an aggregate purchase price of $100,000,000," (*Master Agreement*, at § 2(a)),[3] and paid $100 mil-

---

1. A copy of the Master Agreement is attached as Exhibit B to the *Flaxer Declaration*. 360 Pacific (Bermuda) Ltd. subsequently assigned its rights to 360networks (Holdings) Ltd., and the latter changed its name to 360networks Corporation, the claimant in this case. (*See id.*, Ex. Q.)

2. The Master Agreement is governed by New York law. (Master Agreement, § 9.)

3. The fiber optic cable system constructed by East Asia Crossing Ltd., designated as "EAC," connected various principal cities of East Asia, while the fiber optic cable system constructed by Pacific Crossing Ltd., designated as "PC–1," connected various Japanese cities with the United States. (*Master Agreement*, at p. 1.) Section 2(a) of the Master Agreement

lion (as well as additional amounts for other services) to GC Bandwidth at the time of the closing. (*Id.*, at § 2(c); *Flaxer Declaration*, at Ex. S.)[4] In addition, GC Bandwidth committed itself to provide collocation space in its telehouses, as agreed to by the parties in the future. (*Master Agreement*, at § 3.)

The Master Agreement did not actually provide or transfer any specific capacity. Instead, it granted 360networks the right to order or "takedown" capacity in the future. The right was also extended to 360networks' affiliates. (*Id.*, at § 2(a).) The market price for capacity fluctuated, and the Master Agreement included a price mechanism to deal with future takedowns. GC Bandwidth would charge the lesser of (1) the lowest price for similar capacity offered by GC Bandwidth to nonaffiliates (*i.e.*, GC Bandwidth's most favorable market price) or (2) the price schedule attached as Exhibit C to the Master Agreement. (*Id.*, at § 2(*l*).) In the case of collocation, GC Bandwidth would charge its most favorable market price. (*Id.*, at § 3(b).)

Since 360networks had prepaid $100 million, it was entitled to a credit for each takedown in accordance with this price structure. If the market price for capacity declined, GC Bandwidth would be required to deliver proportionately more capacity to meet its obligations. If, on the other hand, 360networks or its affiliates did not take down capacity, or did not take down the full $100 million that had been prepaid, GC Bandwidth was not required to repay the unused balance.

The Master Agreement spelled out the procedure for taking down capacity under the Asia Commitment. Most important to the present dispute, 360networks had to place an order for capacity within twenty-four months of March 30, 2001. (*Master Agreement*, at § 2(a).) In addition,

Each takedown of capacity pursuant to this Agreement shall be effected by the parties . . . executing and delivering a CPA [Capacity Purchase Agreement], substantially in the form of Exhibit B . . . and a service order form . . . , reflecting the takedown of any additional capacity . . . Each takedown of capacity hereunder shall be noted in the Takedown Schedule attached hereto as Exhibit F . . . *The Takedown Schedule shall be the definitive and conclusive record of all takedowns pursuant to this Agreement.*

(*Id.*, at § 2(d))(emphasis added.)

Section 2(g) of the Master Agreement imposed obligations and elaborate procedures on the parties in connection with planning for 360networks' future needs. During the first thirty-six months following the closing date, they were directed to meet and review all forecasts and anticipated availability of capacity and collocation. The first meeting was to "take place as soon as reasonably practicable following the Closing Date." In addition, 360networks was obligated to "provide to [GC Bandwidth] on a monthly basis a six-month rolling forecast of circuits, and collocation space to be ordered (the 'Order Forecast')." GC Bandwidth had to respond and indicate availability within ten days of receipt of an Order Forecast (the

---

defines the Asia Commitment to include capacity on the EAC and PC–1 systems.

**4.** Exhibit S to the *Flaxer Declaration* contains a copy of *360networks Corporation's First Set of Requests for Admission Directed to Robert L. Geltzer, Chapter 7 Trustee*, dated April 22,

2005. Exhibit A, attached thereto, contains a receipt of Global Crossing Bandwidth, Inc., dated March 31, 2001, acknowledging full payment by 360networks under the Master Agreement.

"Accepted Forecast"). 360networks then had to resubmit an order within fifteen days for any capacity or collocation space included in the Accepted Forecast, and the parties had to execute an order "as soon as practicable thereafter." Upon execution, GC Bandwidth "will be bound to accept such order." [5]

## B. The Guaranty

In what was apparently part of the same transaction, Asia Global delivered a Guaranty, dated March 30, 2001, to 360networks.[6] Asia Global guaranteed the full payment and performance of the Asia Commitment under the Master Agreement, as well as GC Bandwidth's responsibilities under other agreements relating to the provision of collocation space (collectively, the "Guarantied Obligations"). (*Guaranty*, at § 2.1.) The Guaranty expressly provided that Asia Global's obligations remained "unconditional and absolute" notwithstanding the waiver, release or settlement of GC Bandwidth's obligations under the Master Agreement. (*Id.*, at § 2.3(i).) Nevertheless, § 2.3 concluded with the declaration that Asia Global "shall be entitled to assert as a defense to any claim for payment or performance of the Guarantied Obligations that (i) such Guarantied Obligations are not currently due under the terms of the [Master Agreement] or (ii) that such Guarantied Obli-

gations have been previously paid or performed in full."

Finally, § 2.5 addressed a possible GC Bandwidth bankruptcy. Under certain circumstances, 360networks could demand performance directly from Asia Global:

> The Guarantor agrees that, notwithstanding anything to the contrary herein, if Purchaser [360networks] is stayed upon the insolvency, bankruptcy, or reorganization of Grantor [GC Bandwidth] from exercising its rights to enforce or exercise any right or remedy with respect to the Guarantied Obligations, or is prevented from giving any notice or demand for payment or performance or is prevented from receiving any of the Guarantied Obligations in any such case, by such proceeding or action, the Guarantor shall render to the Purchaser upon demand therefor the performance that would otherwise have been due had such rights and remedies been permitted to be exercised by Purchaser.

## C. Subsequent Events

At the time of the agreements, and for some time thereafter, Global Crossing and its subsidiaries, including Asia Global, operated as an integrated corporate structure intent on delivering telecommunications worldwide.[7] The *Affidavit of Dan*

---

5. The Master Agreement required 360networks to take down the capacity within twenty-four months of the closing. Paragraph 2(g), however, contemplated that 360networks could take down capacity up to thirty-six months after the closing. Neither party commented on this inconsistency.

6. A copy of the Guaranty is attached as Exhibit C to the *Flaxer Declaration*. Like the Master Agreement, it is governed by New York law. (*Guaranty*, at § 4.5.)

7. Some overlap existed between the Global Crossing and Asia Global boards. The boards established a special committee to address

conflicts and adverse interests between the two companies. (*Declaration of Alan J. Lipkin in Support of 360networks Corporation's Motion for Summary Judgment on Trustee's Objection to Claim Number 5 and in Opposition to Trustee's Motion for Summary Judgment on the Trustee's Objection*, dated May 6, 2005 ("*Lipkin Declaration*"), Ex. 3 (*Affidavit of Stefan C. Riesenfeld Pursuant to Local Bankruptcy Rule 1007–2*, sworn to Nov. 15, 2002 ("*Riesenfeld Affidavit*"), at ¶ 22).) (ECF Doc. # 613.)

*Cohrs Pursuant to Local Bankruptcy Rule 1007-2,* sworn to Jan. 27, 2002,[8] submitted in connection with Global Crossing's own chapter 11 case, described the telecommunications network created by Global Crossing, (*id.,* at ¶¶ 3, 6–10), and observed that "[s]ervices in Asia and the Pacific are provided through Global Crossing's majority-owned subsidiary, Asia Global Crossing Ltd." (*Id.,* at ¶ 20)(footnote omitted.) In the same vein, the *Riesenfeld Affidavit,* submitted in this case on the filing date, stated that Asia Global provided telecommunications services through "the global fiber-optic telecommunications network owned by its parent, Global Crossing, Ltd. ('Global Crossing'), which allows the Company to provide its customers with connectivity to many cities in North America, South America and Europe." (*Id.,* at ¶ 4.)

A subsequent, severe downturn in the telecommunications industry eventually drove Global Crossing and Asia Global, as well as many of 360networks' United States affiliates, into bankruptcy.[9] The downturn has been attributed to the general downturn in the economy, the inability to raise capital, and the combination of a "stunning increase in capacity and a decrease in the price of telecommunications services across the board." *Disclosure Statement for Debtors' [Global Crossing Ltd., et al] Joint Plan of Reorganization,* dated October 17, 2002, at 51–52 (*see Lipkin Declaration,* Ex. 1.)

Global Crossing's increasing financial problems directly affected Asia Global. Global Crossing had agreed to lend up to $400 million to Asia Global on a subordinated basis. In December 2001, Asia Global requested the much-needed funding but Global Crossing, only a month away from its own chapter 11 filing, refused. (*Riesenfeld Affidavit,* at ¶ 24.)

## D. The Settlement Agreement

By October 2002, Global Crossing was already a chapter 11 debtor; Asia Global's filing was still a month in the future. On October 21, 2002, Global Crossing, Ltd., and various affiliates, including GC Bandwidth, entered into a settlement agreement (the "Settlement Agreement") with 360networks and many of its affiliates, including the United States and Canadian debtors. Among other things, GC Bandwidth and 360networks released each other from any and all claims relating to the Master Agreement. (*Settlement Agreement,* at §§ 4.1, 4.2.)[10] The release expressly excluded Asia Global and any obligations arising under the Guaranty. (*Id.,* at § 4.1.) 360networks paid Global Crossing $500,000.00 in connection with the Settlement Agreement.

The Settlement Agreement also provided for the assumption of several executory contracts and the rejection of others. (*See id.,* at §§ 2.3, 2.4.) The Master Agreement was not assumed or rejected as part of the Settlement Agreement. Instead,

---

**8.** The Cohrs' Affidavit is annexed as Exhibit 2 to the *Lipkin Declaration.*

**9.** Twenty-three 360networks affiliates filed chapter 11 petitions in this Court on or about June 28, 2001. (*See Flaxer Declaration,* Ex. M.) The claimant, 360networks Corporation f/k/a 360networks (Holdings) Ltd., was not one of them. In addition, several Canadian subsidiaries filed for protection under the Companies' Creditors Arrangement Act of Canada. (*See Flaxer Declaration,* Ex. Q (*Set-*

*tlement Agreement,* at p. 2).) This group may have included 360networks. The introductory paragraph of the Settlement Agreement, discussed in the succeeding text, refers to "360networks (Holdings) Ltd." as "petitioner." (*Id.,* at p. 1.) Whether 360networks actually filed in Canada is immaterial to the pending motions.

**10.** The Settlement Agreement is attached as Exhibit Q to the *Flaxer Declaration.*

the Global Crossing chapter 11 plan, which became effective on December 9, 2003, stated that any executory contract that was not specifically assumed was deemed rejected as of the effective date of the Plan. (*Global Crossing Plan*, at § 8.1.) [11] This included the Master Agreement.

### E. Asia Global's Bankruptcy and Sale of Its Assets

On November 17, 2002, and simultaneously with its chapter 11 filing, Asia Global filed a motion to sell substantially all of its assets to Asia Netcom Corporation Limited (the "ANC Sale"). The ANC Sale was approved by the Court on January 29, 2003, and consummated on March 10, 2003. Pursuant to the terms of the agreement governing the sale, the Guaranty was an "excluded liability" that Asia Netcom would not assume. (*Lipkin Declaration*, Ex. 5.) [12]

Three months later, on June 10, 2003, the Court converted Asia Global's chapter 11 case to chapter 7. The United States Trustee appointed Geltzer to act as interim trustee, and he subsequently became permanent trustee by operation of law. *See* 11 U.S.C. § 702(d). (*Trustee's Motion*, at ¶ 3.)

### F. The Cross–Motions for Summary Judgment

On February 20, 2003, 360networks filed a proof of claim against the Asia Global estate in the amount of $100 million based on the Guaranty. The trustee objected to the claim, and during a hearing held on March 10, 2005, the Court granted the

trustee leave to make a motion for summary judgment on the basis that 360networks never requested any capacity either from GC Bandwidth or Asia Global. [13] Hence, liability under the Guaranty was never triggered. 360networks opposed the motion and cross-moved, arguing that its obligation to order capacity was excused because GC Bandwidth and/or Asia Global breached their obligations under the doctrine of anticipatory repudiation.

### DISCUSSION

### A. Standards Governing Summary Judgment Motions

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056, governs summary judgment motions. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing that the undisputed facts entitle him to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir.1995). Where the nonmoving party bears the burden of persuasion at trial on an issue, the moving party can satisfy its initial burden on the motion by demonstrating the absence of factual support for an essential element of the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477

---

**11.** The Global Crossing Plan is attached as Exhibit O to the *Flaxer Declaration*.

**12.** Exhibit 5 to the *Lipkin Declaration* contains an excerpt from the Purchase Agreement between Asia Global and Asia Netcom, dated November 17, 2002, and in particular, Schedule 2.02(b), attached thereto, entitled

"Excluded Liabilities," which lists the Guaranty as no. 5.

**13.** The Court also granted the trustee permission to move for summary judgment on a second basis, but the trustee subsequently withdrew that ground.

U.S. 317, 324–26, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the movant carries this initial burden, the nonmoving party must produce "substantial evidence" to defeat the motion, and the court must evaluate "the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–54, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmovant must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. Fed.R.Civ.P. 56(e). *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. In deciding whether material factual issues exist, the Court must resolve all ambiguities and draw all *reasonable* inferences against. the moving party. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## B. The Trustee's *Prima Facie* Case

■ 360networks' claim in this case is based on a breach of the Guaranty. Under New York law, the party seeking to enforce a contractual duty has the burden of proving the occurrence of any conditions precedent to the performance of the duty. *Diffusion Fin. S.A.R.L. v. Smith*, No. 95 Civ. 2140(SAS), 1997 WL 272391, at *3 n. 7 (S.D.N.Y. May 22, 1997); *Lindenbaum v. Royco Prop. Corp.*, 165 A.D.2d 254, 567 N.Y.S.2d 218, 219 (N.Y.App.Div.1991); *see* N.Y.C.P.L.R. 3015(a)(McKinney 1991). Here, 360networks had to order capacity in accordance with the Master Agreement to trigger the obligation of GC Bandwidth or Asia Global, or both, to provide that capacity.[14] In other words, 360networks cannot prove a breach of the duty to deliver capacity or pay damages for the failure to do so without proving that it asked for it.

Asia Global demonstrated that 360networks cannot prove this essential element of its claim. There is no record that 360networks ever ordered capacity or collocation space in accordance with the Master Agreement prior to March 30, 2003. Similarly, there is no record of any takedown of capacity by 360networks reflected in the Takedown Schedule. (*Flaxer Decla-*

---

**14.** Once GC Bandwidth filed for bankruptcy on January 28, 2002, it could not be forced to perform the Master Agreement prior to assuming it. *See N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 532, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)("We conclude that from the filing of a petition in bankruptcy until formal acceptance, the collective-bargaining agreement is not an enforceable contract within the meaning of NLRA § 8(d)."); *see generally* 5 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 365.03, at 365–27 (15th ed. rev.2005)("The [*Bildisco* Court] majority held that the contract was not binding on the trustee until it was assumed.") In that circumstance, Section 2.5 of the Guaranty gave 360networks the right to demand capacity directly from Asia Global.

After 360networks released GC Bandwidth, Asia Global remained liable under the Guaranty because it expressly agreed in the Guaranty that the release of GC Bandwidth would not affect its liability. In addition, 360networks expressly reserved its rights under the Guaranty against Asia Global in the Settlement Agreement. *E.g. 120 Greenwich Assocs., LLC v. Reliance Ins. Co.*, No. 01 Civ. 8219(PKL), 2004 WL 1277998, at *9 (S.D.N.Y. June 8, 2004); 63 N.Y. JUR.2D, GUARANTY & SURETYSHIP, § 255, at 350 (1987); RESTATEMENT (FIRST) OF SECURITY § 122 (1941); *see Compagnie Financiere De Cic Et De L'Union Europeenne*, 188 F.3d 31, 35 (2d Cir.1999)(a guarantor may consent in advance to remain liable after the release of the principal obligor by consenting "to a waiver of defenses that is broad enough to preclude the defense of release in a subsequent creditor action"). Asia Global nevertheless retained the defense that the Guarantied Obligations were not currently due under the Master Agreement. (*Guaranty*, at § 2.3.)

*ration,* at Ex. K.) [15] Accordingly, the trustee established the estate's defense to 360networks' claim for payment or performance as a matter of law.

▮▮▮ 360networks contends, however, that it was excused from submitting takedown orders under the doctrine of anticipatory repudiation. The burden of establishing that a condition precedent was excused rests on the party seeking to enforce the contract. *See Creighton v. Milbauer,* 191 A.D.2d 162, 594 N.Y.S.2d 185, 188 (N.Y.App.Div.1993); *Lindenbaum,* 165 A.D.2d at 260, 567 N.Y.S.2d 218. In addition, the party asserting an anticipatory repudiation has the burden of proving it. *Record Club of America, Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1275 (2d Cir.1989); *Tradax Energy, Inc. v. Cedar Petrochemicals, Inc.,* 317 F.Supp.2d 373, 377 (S.D.N.Y. 2004). We now turn to this issue, and specifically, whether 360networks carried its burden.

### C. Anticipatory Repudiation

▮▮▮ An anticipatory repudiation occurs when a party to a contract (1) states that he cannot or will not perform his obligations, or (2) commits a voluntary affirmative act that renders the obligor unable or apparently unable to perform his obligations. *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,* 92 N.Y.2d 458, 682 N.Y.S.2d 664, 705 N.E.2d 656, 659 (1998) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 250 (1981)); *see Lucente v. Int'l Bus. Mach. Corp.,* 310 F.3d 243, 258 (2d Cir.2002); *De Lorenzo v. Bac Agency, Inc.,* 256 A.D.2d 906, 681 N.Y.S.2d 846, 848 (N.Y.App.Div.1998); JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 12–4, at 525 (3rd

ed.1987)("CALAMARI & PERILLO"); RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b (1979). "For a statement to constitute an anticipatory breach, 'the announcement of an intention not to perform [must be] positive and unequivocal.'" *Argonaut P'ship, L.P. v. Sidek, S.A. de C.V.,* No. 96 Civ. 1967(MBM), 1996 WL 617335, at *5 (S.D.N.Y. Oct. 25, 1996)(quoting *Tenavision, Inc. v. Neuman,* 45 N.Y.2d 145, 408 N.Y.S.2d 36, 379 N.E.2d 1166, 1168 (1978)), *aff'd on grounds stated in district court op.,* 141 F.3d 1151 (2d Cir.1998).

▮▮▮ If an anticipatory repudiation occurs, the non-breaching party has two mutually exclusive options. He may elect to treat the contract as terminated and exercise his remedies, or continue to treat the contract as valid. *Lucente,* 310 F.3d at 258; *ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F.Supp.2d 383, 388 (S.D.N.Y. 1999); *Strasbourger v. Leerburger,* 233 N.Y. 55, 134 N.E. 834, 835 (N.Y.1922); *Inter–Power of New York, Inc. v. Niagara Mohawk Power Corp.,* 259 A.D.2d 932, 686 N.Y.S.2d 911, 913 (N.Y.App.Div.1999), *leave to appeal denied,* 93 N.Y.2d 812, 695 N.Y.S.2d 540, 717 N.E.2d 699 (1999). If he elects to terminate the contract and sue for breach, he is excused from tendering his own performance. *DeForest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.,* 243 N.Y. 283, 153 N.E. 75, 78, *rearg. denied,* 243 N.Y. 618, 154 N.E. 629 (1926); *Inter–Power of New York, Inc. v. Niagara Mohawk Power Corp.,* 686 N.Y.S.2d at 913; 22A N.Y. JUR.2D, CONTRACTS § 452, at 139–40 (1996).

▮▮▮ To recover damages, however, the non-breaching party must also show that he was ready, willing and able to perform his own obligations but for the

---

**15.** Exhibit K to the *Flaxer Declaration* contains a copy of the *Responses and Objections of 360networks Corporation to Trustee's First* *Set of Requests for Admission,* dated April 11, 2005. *See* responses nos. 7, 8, & 9, at p. 6.

repudiation. *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir.1990); *In re Randall's Island Family Golf Ctr.*, 272 B.R. 521, 524 (S.D.N.Y.2002); *Argonaut P'ship L.P.*, 1996 WL 617335, at *5; *Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc.*, 60 N.Y.2d 997, 471 N.Y.S.2d 267, 459 N.E.2d 492, 492 (1983); *DeForest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*, 153 N.E. at 78; RESTATEMENT (SECOND) OF CONTRACTS § 254(1); *see Strasbourger*, 134 N.E. at 836. "This principle is merely the application of the general rule that the complaining party must demonstrate that the breach caused him injury; '[t]o do this he must prove that he intended to and was able to perform when his performance was due.'" *Record Club of Am.*, 890 F.2d at 1275 (quoting *Scholle v. Cuban–Venezuelan Oil Voting Trust*, 285 F.2d 318, 320 (2d Cir.1960)). Thus, even where a party breaches by repudiation, "[h]is duty to pay damages is discharged if it subsequently appears that there would have been a total failure of performance by the injured party . . . sufficient to have discharged any remaining duties of the party in breach to render performance." RESTATEMENT (SECOND) OF CONTRACTS § 254(1), cmt a.[16]

■ The doctrine of anticipatory repudiation is related to but distinct from the rule that allows an obligee to demand adequate assurance of future performance. An obligor's statement or voluntary act may be equivocal, and not provide clear grounds to declare an immediate breach.

In that situation, the obligee declares a repudiation at his peril. Or the obligor may say or do nothing that suggests his unwillingness or inability to perform, but the circumstances may nonetheless indicate that performance is not likely. In these situations, the obligee is entitled— but not required—to seek assurances from the obligor that he will perform when the time for performance arrives. RESTATEMENT (SECOND) OF CONTRACTS § 251(1). If the demand is proper and reasonable assurance is not forthcoming, the obligee may treat the failure as a repudiation. *Id.*, at § 251(2).

The right to demand adequate assurance of future performance was initially limited in New York to situations involving the sale of goods covered by N.Y.U.C.C. § 2–609.[17] In *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 682 N.Y.S.2d 664, 705 N.E.2d 656 (1998), the Court of Appeals adopted the U.C.C. rule of adequate assurance as part of the common law of contracts. The facts of that case are instructive.

There, Niagara Mohawk had entered into a twenty-five year contract to buy power from Norcon. The price depended on market factors whose effect could not be calculated until the end of each period identified in the contract. The price was adjusted at the end of each period, and if a balance existed in favor of a party, that party was entitled to the payment of the balance from the other party. *Id.* at 658.

---

16. The duty to pay damages will also be discharged if the obligation that was repudiated would have been discharged by impracticability or frustration prior to the time that performance would have been due. RESTATEMENT (SECOND) OF CONTRACTS § 254(2) & cmt. b.

17. Section 2–609(1) states:
 A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

During the term of the contract, Niagara Mohawk determined that it would be entitled to a credit of over $610 million at the end of the current period, and became concerned that Norcon would not be able to satisfy the escalating credits that accrued in the next period. *Id.* at 658. Consequently, Niagara Mohawk demanded that Norcon provide adequate assurance that it would perform its future payment obligations. *Id.* Rather than give the assurance, Norcon sued Niagara Mohawk in federal district court for declaratory relief that the latter had no right to demand adequate assurance in a non-U.C.C. situation under New York law. *Id.* The district court granted Norcon's motion for summary judgment, but the Second Circuit certified the question to the New York Court of Appeals. *See Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,* 110 F.3d 6 (2d Cir.1997).[18]

The New York Court of Appeals observed that the right to demand adequate assurance sprang from the doctrine of anticipatory repudiation. 92 N.Y.2d 458, 682 N.Y.S.2d 664, 705 N.E.2d at 659. After discussing anticipatory repudiation, the Court turned to the equivocal situation mentioned earlier:

> When, however, the apparently breaching party's actions are equivocal or less certain, then the nonbreaching party who senses an approaching storm cloud, affecting the contractual performance, is presented with a dilemma, and must weigh hard choices and serious consequences.

*Id.*

The Court stated that U.C.C. § 2–609 "successfully implements the laudatory ob-

jectives of quieting the doubt a party fearing repudiation may have, mitigating the dilemma flowing from that doubt, and offering the nonbreaching party the opportunity to interpose timely action to deal with the unusual development." *Id.* at 660. The Restatement (Second) of Contracts § 251, which mirrors U.C.C. § 2–609, recognizes the underlying principle " 'that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain.' " *Norcon Power Partners,* 682 N.Y.S.2d 664, 705 N.E.2d at 661 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 251 cmt. a, quoting U.C.C. § 2–609 cmt. 1.) The Court concluded that the policies underlying U.C.C. § 2–609 should apply to the type of controversy involved in the case before it, and accordingly, answered the certified question in the affirmative. *Id.* at 662.

■ In *Norcon,* the insecurity arose from the effect of market conditions on the price of power, and Norcon's ability to perform in light of those changed conditions. To some extent, 360networks makes a similar argument to support its claim of anticipatory repudiation. For example, 360networks points out that the general economy soured in the second half of 2001, and the telecommunications industry was hit by increased capacity, reduced prices and shrinking sources of capital. (*360networks Corporation's Statement Pursuant to Local Bankruptcy Rule 7056–1,* dated May 6, 2005 ("*360networks' 7056 Statement*"), at ¶¶ 10–11)(ECF Doc. # 611.) It also points to the dramatic price declines that yielded a corresponding increase in the amount of capacity that

---

**18.** The certified question asked: "Does a party have the right to demand adequate assurance of future performance when reasonable grounds arise to believe that the other party will commit a breach by non-performance of a contract governed by New York law, where the other party is solvent and the contract is not governed by the U.C.C.?" *Norcon Power Partners,* 110 F.3d at 9.

360networks was entitled to takedown under the Asia Commitment. (*Id.*, at ¶ 12.) Moreover, 360networks emphasizes that as the situation deteriorated, the Global Crossing and Asia Global corporate interrelationship unraveled, (*see id.*, at ¶ 13), and Global Crossing refused to fund Asia Global, causing the latter over $800 million in damages. (*Id.*, at ¶ 14.)

These "facts," and particularly the changing market conditions, may explain why 360networks and its financially-distressed affiliates never took down any capacity. They do not, however, constitute anticipatory repudiations. They were neither statements nor acts by GC Bandwidth or Asia Global relating to their willingness to perform the Master Agreement or the Guaranty. At most, they may have given rise to the type of insecurity that would have justified a demand for adequate assurance of future performance. 360networks never made such a demand.

Accordingly, we turn to the statements and acts identified by 360networks that, it contends, constituted an anticipatory repudiation, excused it from tendering its own performance, namely ordering capacity, and entitled it to sue for total breach of the Asia Commitment.[19] (*See 360networks Corporation's Memorandum of Law in Support of Motion for Summary Judgment and in Opposition to Chapter 7 Trustee's Motion for Summary Judgment on Objection to Claim Number 5*, dated May 6, 2005 ("*360networks' Memorandum*"), at p. 13)(ECF Doc. # 612.) Some relate to what GC Bandwidth supposedly said or did, and others relate to Asia Global. They are addressed separately below.

### 1. GC Bandwidth

■ 360networks failed to raise a triable issue concerning its contention that GC Bandwidth repudiated the Master Agreement prior to the Settlement.[20] First, it maintains that "GC Bandwidth advised 360networks that the capacity due under the Asia Commitment would not be provided and actively worked to preclude such usage." (*Id.*) There is not evidence to support this position beyond the hearsay statements of 360networks' attorneys.

19. There is a question whether 360networks made an election, and if so, whether it informed either GC Bandwidth or Asia Global. I assume for the purposes of the motion that 360networks satisfied these conditions. First, there is no specific time limit to make an election, and generally, an election need not be made until the time comes when the non-repudiating party must tender performance. *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d at 259. Second, the commencement of a lawsuit is an objective expression of a party's intent to treat a repudiation as a final breach of the contract. *Lake Erie Distribs., Inc. v. Martlet Importing Co.*, 221 A.D.2d 954, 634 N.Y.S.2d 599, 601 (N.Y.App.Div.1995). In this case, 360networks filed its proof of claim on February 20, 2003, prior to the expiration of the twenty-four month time period to order capacity.

20. GC Bandwidth's chapter 11 filing did not constitute an anticipatory repudiation since it could have opted to assume the Master Agreement at any time prior to rejection. *See Central States, Southeast & Southwest Areas Pension Fund v. Basic American Indus., Inc.*, 252 F.3d 911, 916 (7th Cir.2001) (Posner, J.) ("Affirmance is the opposite of repudiation, and the affirmance option thus makes it impossible to consider the declaration of bankruptcy itself, whether or not there is an ipso facto clause, a repudiation of a creditor's claim."), *cert denied*, 534 U.S. 1079, 122 S.Ct. 808, 151 L.Ed.2d 694 (2002); *Beeche Sys. Corp. v. D.A. Elia Constr. Corp. (In re Beeche Sys. Corp.)*, 164 B.R. 12, 16 (N.D.N.Y.1994) (if the mere filing of a bankruptcy constituted an anticipatory repudiation, the decision to assume or reject would never be reached, rendering § 365 meaningless); *In re Economy Lodging Sys., Inc.*, 226 B.R. 840, 846 (Bankr.N.D.Ohio 1998) ("A bankruptcy filing is not of itself an anticipatory repudiation by the debtor of an executory contract."), *aff'd*, 234 B.R. 691 (6th Cir. BAP 1999).

They are insufficient to raise a triable issue or defeat Asia Global's motion. *See Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 45 n. 9 (2d Cir.1980)("A hearsay affidavit is a nullity on a motion for summary judgment.").

Second, 360networks contends that GC Bandwidth's rejection of the Master Agreement under the Global Crossing plan resulted in an anticipatory repudiation that related back to January 28, 2002, the petition date. Under § 365(g) of the Bankruptcy Code, the rejection is deemed to constitute a breach as of GC Bandwidth's petition date.[21] 360networks reasons that § 365(g) also fixed the repudiation date, and finds support in a similar argument advanced by Asia Global.[22]

The argument ignores the holding in *Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379 (2d Cir. 1997). In *Lavigne*, a medical doctor filed a chapter 11 petition on October 8, 1992, and the Court converted the case to chapter 7 on January 27, 1994. *Id.* at 382. At the time of the conversion, the debtor maintained a malpractice policy that did not terminate until April 1, 1994.[23]

The insured had the right to purchase extended tail coverage within sixty days of the termination of the insurance policy. *Id.* As an executory contract, the insurance policy was deemed rejected sixty days after the conversion date, or on March 27, 1994. *Id.* at 383. The trustee purported to exercise the right to purchase tail insurance on May 3, 1994, or within sixty days of the contract termination and "deemed" rejection dates. *Id.*

The insurer argued that the termination date related back under § 365(g) to the petition date, or at the latest, the conversion date. *Id.* at 389. Both dates occurred more than sixty days before the trustee tried to buy tail insurance. According to the insurer, the right to purchase extended tail insurance lapsed before the trustee attempted to exercise it (and, in fact, before he was even appointed).

Agreeing with the trustee, the Court rejected the relation back argument. Section 365(g), the Court observed, determines the priority of a rejection damage claim, and its purpose is to make clear that the non-debtor party under a rejected contract is simply an unsecured creditor. *Id.* at 389; *accord Miller v. Chateau Communities, Inc. (In re Miller)*, 282 F.3d 874,

---

**21.** Section 365(g) provides in pertinent part as follows:

> Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition....

**22.** Because Asia Global also relied on the relation back argument in a different context, 360networks maintains that Asia Global is bound by this admission of fact. (*360networks Corporation's Reply Memorandum of Law in Support of 360networks Corporation's Motion for Summary Judgment on Chapter 7 Trustee's Objection to Claim Number 5 and in Response to Chapter 7 Trustee's Opposition Thereto*, dated May 20, 2005 ("*360networks' Reply*"), at 12–13)(ECF Doc. # 629.) The relation back effect of § 365(g) is an argument of law, not a statement of fact. The Court did not adopt it, and judicial estoppel does not lie. *See Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 3 (2d Cir.1999) ("a party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner").

**23.** The debtor had previously cancelled the policy, but the Court held that the cancellation was ineffective. *Lavigne*, 114 F.3d at 385.

877 (6th Cir.2002) S.Rep. No. 95–989, at 60 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5846 ("[t]he purpose [of § 365(g)(1)] is to treat rejection claims as prepetition claims."); H.R.Rep. No. 95–595, at 349 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6305–6306 (same). However, "[f]or the purpose of determining the proper termination date, the deemed rejection date should be used because it was the rejection that ended the coverage under the primary policy." *In re Lavigne*, 114 F.3d at 389.

The relation back argument is even more attenuated in this case. Whatever effect the GC Bandwidth rejection might have had on the priority of claims in its own case, it had no effect in this case. GC Bandwidth rejected the Master Agreement on December 9, 2003, and under the rationale of *Lavigne*, the breach signified by that rejection occurred on that date. As this was after the twenty-four month period within which 360networks had to takedown capacity, the rejection was irrelevant.

Third, the Settlement Agreement did not imply, as 360networks contends, that GC Bandwidth could not fulfill the Asia Commitment. The Settlement Agreement resolved the outstanding issues under several agreements. Obviously, the Court does not know the terms of the other agreements or the outstanding issues. Nevertheless, 360networks' willingness to pay Global Crossing $500,000.00 despite its alleged entitlement to a $100 million credit under the Master Agreement suggests—if it suggests anything at all—that 360networks was in breach of the Master Agreement, it was unable to order capacity, and it had no right to demand the repayment of the $100 million.

In short, 360networks failed to offer any evidence that GC Bandwidth repudiated its obligations prior to the Settlement Agreement. After the Settlement Agreement, it could no longer breach the Master Agreement, and Asia Global stepped in as the sole party obligated to perform the Asia Commitment.[24] Nevertheless, 360networks still had to request a takedown of capacity from Asia Global, which it never did. This leads to the question of whether Asia Global repudiated its obligations, relieving 360networks of the need to fulfill this condition precedent.

### 2. Asia Global

360networks points to three separate acts by Asia Global, each of which, it contends, amounted to an anticipatory repudiation. According to 360networks, Asia Global

> made it clear it would not cooperate by offering to acquire the $100 million Asia Commitment for $5 million, by other express statements, and by liquidating through the ANC Sale [ ] all [of Asia Global's] assets necessary to fulfill the Asia Commitment *before* the expiration of the two-year period within which 360networks could order such capacity under the Master Agreement.

(*360networks' Memorandum,* at 13.)

### a. The $5 Million Offer

The offer to settle with 360networks did not result in an anticipatory repudiation. This argument is based on a letter dated April 5, 2002, in which Asia Global offered to pay 360networks $5 million in cash to purchase 360networks' rights under the Asia Commitment, and exchange general releases. (*See Flaxer Declaration,* Ex. S.) 360networks rejected

---

**24.** As noted, 360networks could have demanded performance directly from Asia Global after GC Bandwidth filed its chapter 11 petition.

the offer. (*360networks' 7056 Statement*, at ¶ 17.)

Assuming that the fact of the offer was admissible, *but see* Fed.R.Evid. 408,[25] it does not imply anything in particular. There are many reasons why Asia Global might be willing to pay $5 million in exchange for 360networks' rights and a release. Asia Global may have wanted to buy the Asia Commitment to free it up for sale to others, particularly since the corporate empire to which 360networks belonged was mired in United States and Canadian insolvency proceedings. Or Asia Global may have thought that 360networks and its affiliates were not likely to order capacity in light of their own financial condition, and valued the obligation under the Guaranty at only $5 million. Or Asia Global may have wanted to eliminate the need to disclose the $100 million contingent guaranty liability in its financial statements. The offer certainly does not imply that Asia Global did not intend to perform its obligations.

Furthermore, drawing the inference that 360networks asks for is bad policy. "[I]t is axiomatic that the law encourages settlement of disputes." *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir.2001); *accord Williams v. First Nat'l Bank*, 216 U.S. 582, 595, 30 S.Ct. 441, 54 L.Ed. 625 (1910); *Stull v. Baker*, 410 F.Supp. 1326, 1332 (S.D.N.Y.1976). The same rationale underlies Fed.R.Evid. 408. Fed.R.Evid. 408 advisory committee's note (1972).

Treating an offer to settle a contract obligation as an anticipatory repudiation would significantly chill a party's willingness to make a settlement offer in a contract dispute.

#### b. "Other Express Statements"

360networks did not offer evidence of "other express statements" by Asia Global that support a claim of anticipatory repudiation. Like the similar argument directed at GC Bandwidth, it is attorney hearsay and without significance.

#### c. The ANC Sale

 360networks is on firmer ground when it argues that Asia Global's contract to sell its assets free and clear of the Guaranty obligation, or the actual closing of that contract, constituted an anticipatory repudiation. As noted, an anticipatory repudiation occurs when the obligor commits a voluntary and affirmative act that makes it "actually or apparently impossible for him to perform." Restatement (Second) of Contracts § 250, cmt. c. This includes situations in which the obligor transfers or contracts to transfer the specific property that is the subject of the earlier contract, Calamari & Perillo, § 12-4, at 525–26; *see James v. Burchell*, 82 N.Y. 108, 114 (1880)(seller repudiated contract to sell real property by conveying property to third party); Restatement (Second) of Contracts § 250, illus. 5 (1981) (seller repudiated contract to sell real property by entering into a subsequent contract to sell the same property to a

---

**25.** Fed.R.Evid 408 states:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

third party), or more generally, enters into a second contract before the time of performance arrives that "puts it out of his power to keep his contract." *Computer Possibilities, Unlimited, Inc. v. Mobil Oil Corp.,* 301 A.D.2d 70, 747 N.Y.S.2d 468, 475 (N.Y.App.Div.2002) (quoting *Union Ins. Co. v. Central Trust Co.,* 157 N.Y. 633, 52 N.E. 671, 674 (1899)), *leave to appeal denied,* 100 N.Y.2d 504, 762 N.Y.S.2d 874, 793 N.E.2d 411 (2003); *accord Goodman Mfg. Co., L.P. v. Raytheon Co.,* No. 98 Civ. 2774(LAP), 1999 WL 681382, at *8 (S.D.N.Y. Aug. 31, 1999); *see* RESTATEMENT (SECOND) OF CONTRACTS § 251, illus. 1 (a party that contracts to allow a performer to use a concert hall on a specific future date repudiates that agreement by entering into a contract with a third party prior to the time for performance to use the concert hall on the same date); *see also* 22A N.Y. JUR.2D, CONTRACTS § 447, at 134–35 (1996).

Asia Global filed this case on November 17, 2002, and moved that same day to sell substantially all of its assets to Asia Netcom, subject to higher and better offers.[26] The ANC Sale motion attached an unexecuted purchase and sale agreement between Asia Global and Asia Netcom. (*Sale Motion,* Ex. A.) The Court approved the motion on January 29, 2003, and the transaction was consummated on March 10, 2003.

Asia Global's motion to sell all of its assets, without more, did not prevent it from living up to the performance guaranty. The proposed transaction fell outside of Asia Global's ordinary course of business, and required Court approval. *See* 11 U.S.C. § 363(b)(1). Asia Global was not, therefore, bound to perform the ANC Sale contract until Court approval. Prior to approval, Asia Global could withdraw the application and abandon the contract, or the terms of the sale contract could change. The proposed sale contract might have given 360networks pause and entitled it to demand adequate assurance of future performance, but it did not legally prevent Asia Global from meeting its obligations.

Once the Court approved the contract, however, Asia Global lost control of the ability to satisfy the performance guaranty. At that point, it was obligated to transfer the assets that were necessary to that performance to Asia Netcom, free and clear of the obligation to perform. *A fortiori,* the consummation of the sale rendered Asia Global incapable of satisfying the performance guaranty. Accordingly, Asia Global breached the Guaranty through anticipatory repudiation on January 29, 2003, with two months remaining during which 360networks could takedown capacity.

## D. Further Proceedings

■ Based on the foregoing, the trustee's motion is denied, and 360networks' cross-motion is granted, but only to the extent that Asia Global's anticipatory repudiation, as of January 29, 2003, has been established as a matter of law. This conclusion still leaves one material factual dis-

---

**26.** *See Motion of Asia Global Crossing Ltd. for an Order, Under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr.P.2002, 6004 and 6006, (A) Authorizing and Scheduling an Auction for the Sale of All or Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving Bidding and Auction Procedures, (C) Approving a Break-up Fee and Other Bid Protections, (D) Approving Procedures to Determine Cure Amounts Relating to Assumed Contracts, (E) Approving Notice Procedures, Including the Form, Manner and Scope of Notice, in Connection with the Auction and the Sale Hearing, (F) Setting a Deadline for Filing Objections to Debtor's Motion Seeking Approval of Sale, and (G) Setting a Date and Time for Hearing on Proposed Sale Resulting from Auction, dated Nov. 17, 2002 (ECF Doc. # 17)(the "Sale Motion").*

pute. As stated earlier, 360networks must show that it was ready, willing and able to perform its obligations but for Asia Global's anticipatory repudiation. In other words, it must show that it was ready, willing and able to takedown capacity between January 29, 2003 and March 30, 2003.

In addition, several material facts are deemed to be established and will not be revisited at the trial. Once the trustee carried his initial burden, 360networks had to come forward with admissible evidence showing that it had satisfied the conditions precedent to recovery under the Guaranty, or that the conditions were excused. Except for evidence of anticipatory repudiation relating to the ANC Sale, it failed to offer such evidence. Accordingly, an order under Rule 56(d) of the Federal Rules of Civil Procedure is appropriate. *See Wantanabe Realty Corp. v. City of New York*, 315 F.Supp.2d 375, 404 (S.D.N.Y.2003)(despite denial of defendants' motion for summary judgment, plaintiffs' failure to adduce admissible evidence of racial animus, on which they had the burden of proof, justified determination under Rule 56(d) "that no such animus existed or played any role in the events at issue"). The following material facts therefore exist without substantial controversy: (1) 360networks never ordered capacity in accordance with the Master Agreement from either GC Bandwidth or Asia Global prior to March 30, 2003, (2) 360networks never demanded adequate assurance of future performance from either GC Bandwidth or Asia Global prior to March 30, 2003, (3) GC Bandwidth did not repudiate the Master Agreement, and (4) Asia Global repudiated the Guaranty on January 29, 2003, but not before then.

The parties are directed to arrange a hearing to schedule a trial regarding 360networks' readiness, willingness and ability to perform in accordance with this opinion.

So ordered.