**In re ASIA GLOBAL CROSSING, LTD. et al., Debtor.**

**No. 02–15749 (SMB).**

United States Bankruptcy Court, S.D. New York.

Dec. 13, 2007.

Jeanne M. Luboja, Esq., Eilish M. Cahalan, Esq., Adam S. Ross, Esq., of Counsel, Willkie Farr & Gallagher LLP, New York City, for 360networks Corporation.

Adam C. Silverstein, Esq., Stacy H. Schneider, Esq., of Counsel, Golenbock Eiseman Assor Bell & Peskoe LLP, New York City, for Robert L. Geltzer, Chapter 7 Trustee.

## POST–TRIAL DECISION EXPUNGING CLAIM NO. 5.

STUART M. BERNSTEIN, Chief Judge.

360networks Corporation ("360networks") filed a $100 million proof of claim in this case. The claim is based on a guarantee (the "Guaranty") given by the debtor, Asia Global Crossing, Ltd. ("Asia Global"). The background to the dispute, discussed at length in *In re Asia Global Crossing, Ltd.*, 326 B.R. 240 (Bankr. S.D.N.Y.2005), culminated in a two day trial, which centered on 360networks' readiness, willingness and ability to perform following Asia Global's anticipatory repudiation. The Court concludes that 360networks failed to sustain its burden of proof, and expunges 360networks' proof of claim.

## BACKGROUND[1]

At all relevant times, 360networks and the Global Crossing group of companies, of which Asia Global was a member, were global fiber optic telecommunications carriers. (*See* CX 14.) The Global Crossing group had built a worldwide network from its own fiber optic cables, including Pacific Crossing–1 ("PC–1") and East Asia Crossing ("EAC"). (*Id.*) 360networks, on the other hand, operated a "patch quilt network." It would sometimes purchase parts of its network from other telecommunications carriers and providers, and "patch together various networks from other providers [in addition to its own network] and tie them all together." (Tr. (7/26) at 27.) Neither party sold their capacity to end users, such as telephone or Internet customers. Instead, they sold their capacity to other carriers who, in turn, sold to the end users. (Tr. (7/26) at 150.)

### A. The March 31, 2001 Transactions

The dispute between the parties had its origins in 360networks' plan to operate a

1. The following conventions are used in citing to the trial record. The daily transcript is cited by date and page. For example, "Tr. (7/26) 10" refers to page 10 of the July 26, 2007 transcript. "CX" refers to 360networks' trial exhibits and "TX" refers to the trustee's trial exhibits.

worldwide telecommunications network, including service to Japan. (Tr. (7/26) at 27; Tr. (7/27) at 7–9, 64.) It did not have the existing telecommunications capacity to service Asia. Rather than incur the cost of building its own network, (*see* Tr. (7/27) at 81–82), 360networks opted to purchase the right to use capacity on Global Crossing's Asian network. (Tr. (7/26) at 31–34; Tr. (7/27) at 7–8.) It accomplished this primarily through two agreements described immediately below.

### 1. The Master Agreement

On or about March 30, 2001, 360networks (Holdings) Ltd. and 360Pacific (Bermuda) Ltd. entered into a contract with GC Bandwidth, a member of the Global Crossing group, to purchase $150 million worth of telecommunications capacity (the "Master Agreement").[2] (CX 14.) 360networks prepaid the entire amount.[3] Of the $150 million, $100 million related to the delivery of capacity over the EAC and/or PC–1 fiber optic cable systems that linked the United States and Asia (the "Asia Commitment").

The Master Agreement did not actually provide or transfer any specific capacity. Instead, it granted 360networks (as well as its affiliates) the right to order or "takedown" capacity in the future. Since 360networks had prepaid $100 million, it was entitled to a credit for each takedown in accordance with the price structure established under the Master Agreement. GC Bandwidth agreed to charge 360networks the lesser of (1) the lowest price for similar capacity offered by GC Bandwidth to non-affiliates (the "Most Favored Cus-

tomer" or "MFC" price) or (2) the price schedule attached as Exhibit C to the Master Agreement. (*Id.*, at § 2(*l* ).) If the market price for capacity declined, GC Bandwidth would be required to deliver proportionately more capacity to meet its obligations.

Most important to the present dispute, 360networks had to order the capacity within twenty-four months of March 30, 2001. (Master Agreement, at § 2(a).) Section 2(g) of the Master Agreement imposed obligations and elaborate procedures on the parties in connection with planning for 360networks' future needs. They were required to meet on a regular basis to review all forecasts and anticipated availability of capacity and collocation. 360networks was obligated to "provide to [GC Bandwidth] on a monthly basis a six-month rolling forecast of circuits, and collocation space to be ordered (the 'Order Forecast')." GC Bandwidth had to respond and indicate availability within ten days of receipt of an Order Forecast (the "Accepted Forecast"). 360networks then had to resubmit an order within fifteen days for any capacity or collocation space included in the Accepted Forecast, and the parties had to execute an order "as soon as practicable thereafter." Upon execution, GC Bandwidth "will be bound to accept such order."

To order capacity, 360networks had to designate a specific route and unit of capacity on the Asia network. (*See id.*, at § 2(d).) Under the Master Agreement,

> Each takedown of capacity pursuant to this Agreement shall be effected by the parties . . . executing and delivering a

---

**2.** The Master Agreement was governed by New York law. (Master Agreement, § 9.)

**3.** 360networks did not actually go "out of pocket." The Global Crossing entities simultaneously agreed to buy $200 million worth of North American capacity from 360network

entities. The transactions were netted out, and Atlantic Crossing, Ltd., a Global Crossing entity, delivered a $50 million check to 360networks (Bermuda) Holdings, Ltd. (*See* CX 16.)

CPA [Capacity Purchase Agreement], substantially in the form of Exhibit B . . . and a service order form . . . reflecting the takedown of any additional capacity . . . Each takedown of capacity hereunder shall be noted in the Takedown Schedule attached hereto as Exhibit F . . . .

(*Id.*, at § 2(d).)

The term of any IRU (Indefeasible Right of Use) resulting from a takedown ran for 15 years. (*Id.*, at § 5.) During the 15–year term, GC Bandwidth was solely responsible for the operations and maintenance of the system at no additional cost to 360networks, although the cost was factored into the purchase price. (*See id.*, at § 4.) 360networks had the unilateral right to renew the IRU for an additional five-year term, but in that event, had to pay GC Bandwidth a maintenance charge not to exceed 1.5% of the original purchase price for the capacity. (*Id.*, at §§ 4, 5.) In addition, 360networks could renew an IRU for a second five-year term, but only with GC Bandwidth's consent. (*Id.*, at § 5.)

Finally, the Master Agreement also provided 360networks with "portability" rights. After a takedown, 360networks could switch the circuits, or routes, within two years of the activation date of the specific capacity. (*Id.*, at § 2(m).) To exercise this right, 360networks had to pay a one-time $15,000 fee per end changed plus the difference, if any, between the capacity rates. (*Id.*)

**B. The Guaranty**

As part of the same transaction, Asia Global delivered the Guaranty, dated March 30, 2001, to 360networks. (CX 15.)[4] Asia Global guaranteed the full payment and performance of the Asia Commitment under the Master Agreement, as well as GC Bandwidth's responsibilities under other agreements relating to the provision of collocation space (collectively, the "Guarantied Obligations"). (Guaranty, at § 2.1.) The Guaranty expressly provided that Asia Global's obligations remained "unconditional and absolute" notwithstanding the waiver, release or settlement of GC Bandwidth's obligations under the Master Agreement. (*Id.*, at § 2.3(i).) Nevertheless, § 2.3 stated that Asia Global "shall be entitled to assert as a defense to any claim for payment or performance of the Guarantied Obligations that (i) such Guarantied Obligations are not currently due under the terms of the [Master Agreement] or (ii) that such Guarantied Obligations have been previously paid or performed in full." Finally, if GC Bandwidth went into bankruptcy, and 360networks could not demand payment or performance from GC Bandwidth, it could demand it directly from Asia Global.[5] (*Id.*, at § 2.5.)

**C. 360networks' Changed Circumstances**

At the time of the transactions, 360networks, like many other telecommunication companies, was facing its own financial problems. Among the factors contributing to its financial distress were (1) an oversupply of capacity resulting in significant price erosion; (2) a shift in customer buying habits from IRU purchases to leases, generally for economic reasons; and (3) customer reluctance to purchase capacity from or engage in a long-term relationship

4. The Guaranty was also governed by New York law. (Guaranty, at § 4.5.)

5. On January 28, 2002, Global Crossing and numerous of its subsidiaries, including GC Bandwidth, filed for chapter 11 protection. As a result, Asia Global became primarily responsible for GC Bandwidth's payment and performance obligations under the Master Agreement.

with 360networks because of its weak balance sheet. (TX DI, at pp. 11–12; *see* (Tr. (7/27) at 32–34).) On June 28, 2001, less than three months after signing the Master Agreement, 360networks filed for protection under Canada's Companies' Creditors Arrangement Act (the "CCAA"). (*See* TX DI, at p. 1.) Its other Canadian and United States affiliates filed for bankruptcy protection in Canada and the United States, respectively, at the same time.[6]

### D. Marketing Efforts

Within weeks of the March 31st transactions, and undoubtedly due to its own financial problems, 360networks decided to abandon its plans to develop trans-Pacific capacity. (Tr. (7/27) at 34–35.) Given the choice between leasing Asian capacity to other carriers and conducting a fire sale, 360networks chose the fire sale as the cheaper alternative. (*See* Tr. (7/27) at 40–41, 50–51; TX DM.)

Throughout the remainder of 2001 and into the beginning of 2002, 360networks aggressively marketed the capacity. (*See* CX 173; Tr. (7/26) at 114–17, 131–33, 37–139; Tr. (7/27) at 11–16.) Its sales staff pursued two approaches: (1) selling individual circuits, or a "bucket" of circuits, to various customers; and (2) selling the entire Asia Commitment to a single third

party. (*See* CX 74, 82, 113, 173, 180, 213.) 360networks could order capacity without a back-up customer on tap, but did not follow that practice. Generally, its efforts followed the same pattern. 360networks' staff first gauged customer interest in particular routes on the Asian system. It then sought pricing from Global Crossing or Asia Global with respect to routes identified by particular customers. After receiving the pricing information, 360networks quoted a price or prices to customers. (*See* Tr. (7/26) at 109, 117–20, 164–65; CX 204.)

The record reflected only one exception to this practice. In May 2001, Asia Global ran a promotion to sell 2.5–gigabyte wavelengths. (Tr. (7/26) at 122–23.) 360networks sent a letter of intent to purchase two 2.5–wavelengths between Seattle and Tokyo, and expressed its intention to use the credit under the Master Agreement to pay for it. (CX 82.) 360networks did not have a customer lined up at the time. (Tr. (7/26) at 125.) Asia Global responded that 360networks could not use the credits to purchase under the promotion. (Tr. (7/26) at 125–26.)[7] 360networks did not buy the capacity mentioned in the letter of intent, and continued to market the capacity and receive price quotes from Asia Global.

---

**6.** Prior to the United States and Canadian petition dates, 360Pacific (Bermuda) Ltd. assigned its interest in the Master Agreement to 360networks (Holdings) Ltd. (Tr. (7/26) at 48–49; CX 157.) 360networks(Holdings) Ltd. changed its name to 360networks Corporation, the creditor in this case. (*See* CX 236.)

**7.** This incident, and Asia Global's concern that 360networks could undercut its own sales efforts, (*see* CX 64; Tr. (7/26) at 134–35), appear to underlie the charge that Asia Global interfered with 360networks' marketing efforts. There was no evidence that Asia Global's concern about competition affected the actual prices that it quoted.

360networks argument also interjects a theory that was not tried. Although 360networks had made the general claim that GC Bandwidth (and Asia Global) repudiated the Master Agreement, *Asia Global,* 326 B.R. at 252, and thereby triggered the $100 million Guaranty, it did not contend during the prior, extensive motion practice that GC Bandwidth (or Asia Global) breached the Master Agreement on any specific occasion by failing to offer the Most Favored Customer price. If Asia Global quoted an inflated price in connection with a particular transaction, its action might give rise to a discrete breach of contract claim but would not constitute an anticipatory breach of all future obligations.

(*See, e.g.,* CX 113, 180; Tr. (7/26) at 127–29.)

## E. The Proposed Sale Back to Asia Global

Unable to liquidate the Asian capacity, 360networks began to consider the alternative of selling "the capacity back to [Global Crossing] for $25 [million], to offset a $25 [million] credit that Global Crossing [was] entitled to from 360networks." (TX DQ; *see* Tr. (7/26) at 172–73.) In or about April 2002, Asia Global informed 360networks that it was interested in repurchasing the Asian capacity for $5 million. (CX 220.) 360networks' senior management rejected the offer as too low. (Tr. (7/27) at 97.)

In June 2002, James Millstein, Asia Global's financial advisor at Lazard Freres, informed 360networks' Chief Financial Officer, Christopher Mueller, that Asia Global was considering a sale of its assets, (Tr. (7/27) at 98), possibly through a restructuring. (Tr. (7/27) at 101.) Mueller interpreted this to mean that Asia Global would file for bankruptcy and reject the Asia Commitment or otherwise free itself from the obligation.[8] (Tr. (7/27) at 101.) Millstein encouraged "us to take another look at an increased offer or at least respond to the original offer in a number that was more palatable to us." (Tr. (7/27) at 100.) 360networks responded

that it was willing to consider an offer in the $20 million range. (Tr. (7/27) at 101.)

The parties eventually agreed on a repurchase price of $12 million in October 2002. (*See* CX 226, 227; Tr. (7/27) at 102–03.) According to Mueller, the amount of the offer reflected the anticipated dividend on 360networks' $100 million claim in an Asia Global bankruptcy, (Tr. (7/27) at 103–04), although Asia Global was not in bankruptcy at the time. The agreement was never consummated, apparently because Asia Global's bondholders objected to it. (*See* Tr. (7/27) at 106–07; CX 228.) After discussions with Asia Global ended in October 2002, 360networks did nothing further, and "wanted to see what would develop on the Asia Global Crossing front." (Tr. (7/27) at 119.)

## F. The Settlement With Global Crossing

On October 21, 2002, Global Crossing and various affiliates, including GC Bandwidth, entered into a settlement agreement (the "Settlement Agreement") with 360networks and many of its affiliates. (*See* CX 237.) Among other things, 360networks paid Global Crossing $500,000, (Settlement Agreement, at § 1.1), and GC Bandwidth and 360networks exchanged mutual releases with re-

---

**8.** Mueller later testified that the only reason 360networks considered any offer from Asia Global was because "we were advised that we weren't going to get it [the capacity]." (Tr. (7/27) at 135.) 360networks requested a finding of fact, based on this testimony, that "Millstein also informed Mueller *in no uncertain terms* that AGC would never deliver the Asian Capacity to 360networks." (emphasis added.) (*360networks Corporation's Amended Proposed Findings of Fact and Conclusions of Law Regarding Chapter 7 Trustee's Objection to 360networks Corporation's Claim*, dated Oct. 3, 2007, at ¶ 38) (ECF Doc. # 924.)

The proposed finding is disingenuous; there was no evidence that Millstein said any

such thing, much less "in no uncertain terms." Rather, Millstein mentioned restructuring (as a possibility), and Mueller interpreted this as a threat to file bankruptcy and reject the Asia Commitment. This Court has already ruled that the motion to sell the assets to ANC did not constitute an anticipatory repudiation, *In re Asia Global Crossing, Ltd.,* 326 B.R. at 256, and *a fortiori,* Millstein's mere mention of a bankruptcy and sale at some future date did not. If Millstein's statements made 360networks nervous or unsure, it could have demanded adequate assurance of future performance, which it did not.

spect to the Master Agreement. (*Id.* at §§ 4.1, 4.2.) The release expressly excluded Asia Global and its obligations under the Guaranty. (*Id.* at § 4.1.) On November 12, 2002, 360networks emerged from bankruptcy as a North American-focused carrier, (Tr. (7/27) at 18–19), with approximately $90,000,000 in cash. (Tr. (7/27) at 115–16; CX 243, at 360N–021972.)

### G. The Asia Global Bankruptcy

Five days later, on November 17, 2002, Asia Global filed its chapter 11 petition. On the same day, it filed a motion to sell substantially all of its assets to Asia Netcom Corporation Limited (the "ANC Sale"). The Court approved the ANC Sale on January 29, 2003. *Asia Global,* 326 B.R. at 256.

On February 20, 2003, 360networks filed proof of claim no. 5 against Asia Global in the amount of $100 million based on the Guaranty. (CX 252.) [9] On November 5, 2004, the Trustee filed an objection to 360networks' claim. The claim objection triggered a succession of summary judgment motions by the parties. As noted, the Court concluded that the motion to approve the ANC Sale did not constitute an anticipatory breach. *In re Asia Global Crossing, Ltd.,* 326 B.R. at 256. Instead, the anticipatory breach occurred when the parties closed the ANC Sale on January 29, 2003, Asia Global transferred substantially all of the assets to ANC, and left itself unable to perform the Asia Commitment. *In re Asia Global Crossing, Ltd.,* 326 B.R. at 256. 360networks nonetheless had to prove that it was ready, willing and able to perform. *Id.* at 249–50.

The Court also concluded that 360networks had failed to adduce any credible evidence that Asia Global committed an

anticipatory breach prior to January 29, 2003. Accordingly, it determined, pursuant to FED.R.CIV.P. 56(d), that the anticipatory breach did not occur earlier than that date. *Id.* at 255–56; *In re Asia Global Crossing, Ltd.,* 332 B.R. 520, 531–33 (Bankr.S.D.N.Y.2005). Although the Court's Rule 56(d) order was not final, 360networks never sought to revisit it. *See id.* at 531 ("An order under Rule 56(d) is not final, and the order may be revised at a later stage in the litigation, upon appropriate notice to the parties, if the circumstances warrant the change."). As a result, the sole issue at trial was whether 360networks was ready, willing and able to perform, *i.e.,* order capacity by March 31, 2003, but for the anticipatory repudiation.

### DISCUSSION

### A. Introduction

■■■ To recover affirmative relief following an anticipatory repudiation, the non-repudiating party must show that he would have performed and he could have performed. "[T]hough a party need not continue to perform the contract after the other party has anticipatorily repudiated it, he must nonetheless demonstrate that he had the willingness and ability to perform before the repudiation and that the plaintiff would have rendered the agreed performance if the defendant had not repudiated." *Record Club of Am., Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1275 (2d Cir.1989); *accord Scholle v. Cuban–Venezuelan Oil Voting Trust,* 285 F.2d 318, 320 (2d Cir.1960)(after a repudiation, the aggrieved party is not required to make a futile tender of performance, but must show "that the breach caused his loss. To do this he must prove that he intended to and was able to perform when

---

**9.** CX 252, as offered and received, consisted of the form proof of claim without any attach-

ments. I assume that the Guaranty was attached to the filed claim.

his performance was due"); 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 39:41 (4th ed.) (Westlaw Database updated Nov. 2007)("After an anticipatory repudiation has occurred, the party facing the repudiation need not perform or even tender performance in the sense of showing a readiness, willingness and ability to perform; rather, that party need only show that before the repudiation, he or she was ready, willing and able to perform, and would have rendered that performance had the other party not repudiated.")

In a lengthy footnote in its post-trial brief, 360networks questioned whether the ready, willing and able requirement actually reflected New York law. (*360networks Corporation's Post–Trial Brief in Support of Allowance of 360networks' Claim*, dated Aug. 28, 2007, at ¶ 17 n. 6)("360 Br.")(ECF Doc. # 910.) 360networks cited three cases, *American List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 550 N.Y.S.2d 590, 549 N.E.2d 1161 (1989); *In re Food Mgmt. Group, LLC*, 372 B.R. 171 (Bankr.S.D.N.Y.2007) and *Scull v. Sicoli*, 247 A.D.2d 852, 668 N.Y.S.2d 827 (N.Y.App.Div.1998), for the proposition that the nonrepudiating party may recover damages for the breach without proving that it was ready, willing or able to perform. The Court has considered these authorities, concludes that they do not accurately reflect the law of New York, and adheres to its earlier determination.

 Two of the decisions require only brief comment. First, 360networks' citation to *Scull* reflects confusion between the non-repudiating party's right to stop performance on the one hand, and recover damages on the other. Following an anticipatory repudiation, the aggrieved party is excused from performing, without re-gard to his readiness, willingness or ability to perform. If, however, he seeks monetary or equitable relief on account of the breach, he must show that he was ready, willing and able to perform. *See Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc.*, 60 N.Y.2d 997, 471 N.Y.S.2d 267, 459 N.E.2d 492, 492 (1983)("Though defendant seller's anticipatory breach of contract relieved plaintiff purchaser of its obligation to tender performance, this did not discharge plaintiff's obligation to show that it was ready and able to perform its own contractual undertakings on the closing date, in order to secure specific performance.")

*Scull* involved both issues. There, the seller committed an anticipatory repudiation of a contract to sell real property. The buyers sued for the return of their deposit, and also sought damages and specific performance. The lower court granted summary judgment to the seller, apparently because the buyers could not show that they were ready, willing and able to perform. On appeal, the appellate division reversed the ruling relating to the security deposit. It held that following the seller's anticipatory repudiation, the buyers were entitled to recover their down payment without proving they were ready, willing and able to perform. *Scull*, 668 N.Y.S.2d at 828. A cause of action to recover a deposit is a form of rescission that seeks a return to the *status quo* rather than damages caused by an anticipatory breach.[10] This is the part of the ruling that 360networks quoted in its footnote.

Conversely, the appellate division affirmed the lower court's grant of summary judgment dismissing the breach of contract and specific performance claims.

---

**10.** 360networks is not seeking to rescind the Master Agreement, which was rejected in Global Crossing's bankruptcy, *In re Asia Global*, 326 B.R. at 247, or the Guaranty, which was "deemed rejected" in this case. *See* 11 U.S.C. § 365(d)(1).

The court held that "plaintiffs had the burden to establish that they were 'ready, willing and able to perform under the contract at some point prior to the commencement of this action,'" and the "plaintiffs failed to meet that burden." *Id.* The post-trial brief ignored this part of the decision, although the ruling directly pertains to the issue before the Court.

Second, while *Food Mgmt.* did state that the non-repudiating party need not prove its ability to perform, it relied on *G.G.F. Props., LLC v. Yu Mi Hong*, 284 A.D.2d 427, 726 N.Y.S.2d 454 (N.Y.App.Div.2001) as its only support. *See Food Mgmt.*, 372 B.R. at 191. *G.G.F.* does not, however, support this proposition. In that case, the buyer of condominium units sued the seller for specific performance. The seller's agent lacked written authority, and the lower court granted motions for summary judgment dismissing the specific performance claim. The appellate division affirmed, and added that in any event, the buyer had repudiated the sale contract, and the agent did not have to prove her ability to perform. *Id.* at 455–56. Neither the seller nor the seller's agent were seeking damages on account of the buyers repudiation; the seller was merely seeking relief from the duty to perform. As noted above, the aggrieved party can stop performance without regard to whether it was ready, willing and able.

The final case cited by 360networks, *American List*, requires more discussion; it is an opinion by New York's highest court on a question of New York law. There, the defendant anticipatorily repudiated a long-term contract to buy mailing lists of names compiled by the plaintiff. The plaintiff sued for damages, and the decision is generally cited for its discussion of the distinction between general and special damages. *See* 549 N.E.2d at 1164.

The lower court awarded judgment to the plaintiff, but discounted the damage award based upon its consideration of the plaintiff's ability to perform in the future. *Id.* Reversing the damage calculation, the New York Court of Appeals stated that "[t]he nonrepudiating party need not ... tender performance nor prove its ability to perform the contract in the future" in order to recover damages. *See* 550 N.Y.S.2d 590, 549 N.E.2d at 1165 (citations omitted).

The statement is a curious digression from well-settled law. In *Aniero Concrete Co. v. New York City Constr. Auth.*, No. 94 Civ. 9111, 1997 WL 3268, at *17 (S.D.N.Y. Jan. 3, 1997), the district court observed that *American List* contradicted the Second Circuit law regarding the New York doctrine of anticipatory repudiation, citing, as an example, the post *American List* decision *Towers Charter Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir.1990).[11] Moreover, the three decisions cited by *American List* do not support the proposition. Instead, those cases held that the non-repudiating party may treat the contract at an end, and is not required to *tender* performance in order to recover for the breach. *See Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 408 N.Y.S.2d 36, 379 N.E.2d 1166, 1168 (1978)("a seller [is] relieved of the obligation to make a tender where the buyer [states] that he would not receive or pay for the goods ... [and] in these circumstances, as a matter of law, defendants may not escape liability by asserting a failure to tender by the seller."), *Nichols v. Scranton Steel Co.*, 137 N.Y. 471, 33 N.E. 561, 565 (1893)(the defendant-buyer's refusal to pay for any further deliveries constituted a repudiation, and the plaintiff-seller was relieved of the duty to make future deliveries); *Windmuller v.*

---

**11.** The *Aniero* court found it unnecessary to resolve the contradiction.

*Pope,* 107 N.Y. 674, 14 N.E. 436, 437 (1887)(same).

*American List* also cited section 978 of Corbin on Contracts for the proposition that "willingness and ability to perform need not continue after wrongful repudiation." 550 N.Y.S.2d 590, 549 N.E.2d at 1165. The statement, though correct, ignored the discussion in the same section of Corbin that the non-repudiating party cannot recover damages unless he can prove his willingness and ability to perform but for the breach:

> In an action for breach by an unconditional repudiation it is still a condition precedent to the plaintiff's right to a judgment for damages that he should have the ability to perform all such conditions. If he could not or would not have performed the substantial equivalent for which the defendant's performance was agreed to be exchanged, he is given no remedy in damages for the defendant's non-performance or repudiation. Of course, the willingness and ability that remains a condition precedent in spite of the defendant's repudiation, is willingness and ability to perform if there had been no repudiation. The defendant's wrongful repudiation justifies the plaintiff in taking him at his word and at once taking steps that may make subsequent performance impossible. The willingness and ability to perform need not continue after the repudiation; it is merely required that they should have existed before the repudiation and that the plaintiff would have rendered the agreed performance if the defendant had not repudiated.

4 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 978, at 924–25 (1951)(footnote omitted)(emphasis added).

*American List* misstated New York law. Its apparent rejection of the ready, willing and able requirement has not been fol-

lowed by the New York Court of Appeals, *see Cipriano v. Glen Cove Lodge # 1458, B.P.O.E.,* 1 N.Y.3d 53, 769 N.Y.S.2d 168, 801 N.E.2d 388, 393 (2003)(following repudiation, the holder of a right of first refusal could not show that he was ready, willing and able to buy the property and was not entitled to specific performance), the Second Circuit Court of Appeals, *see United States v. Hon,* 17 F.3d 21, 26 (2d Cir. 1994)(the non-repudiating party must show, *inter alia,* that it " 'was ready, willing, and able to perform its own obligations under the contract when performance was due.' ")(quoting *Towers Charter Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 523 (2d Cir.1990)), the New York Southern District courts, *see Argonaut P'ship L.P. v. Sidek,* No. 96 Civ. 1967(MBM), 1996 WL 617335, at *5 (S.D.N.Y. Oct. 25, 1996)("To prevail in a breach of contract action, the nonrepudiating party must demonstrate only that it was ready, willing and able to perform its obligations under the contract in the absence of the other party's breach."); *Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 507 (S.D.N.Y.1994) ("Even if Pan Am were excused from performing the conditions precedent to any Delta obligation to provide funding to Pan Am II, Pan Am was not ready, willing and able to satisfy those conditions. Delta therefore cannot be held liable for breach of such an obligation"); and New York's intermediate appellate courts. *See Musick v. 330 Wythe Ave. Assocs., LLC,* 41 A.D.3d 675, 838 N.Y.S.2d 620, 621–22 (N.Y.App.Div. 2007)("there was sufficient evidence demonstrating that the defendant entered into a purchase agreement for the sale of real property . . ., that it repudiated the contract in a manner constituting an anticipatory breach . . ., and that the plaintiff was ready, willing, and able to perform her obligations under the purchase agreement.") (citations omitted); *Fridman v.*

*Kucher*, 34 A.D.3d 726, 826 N.Y.S.2d 104, 106 (N.Y.App.Div.2006) ("A purchaser who seeks specific performance of a contract for the sale of real property must demonstrate that he or she was ready, willing, and able to perform the contract, regardless of any anticipatory breach by a seller."); *Petrelli Assocs., Inc. v. Germano*, 268 A.D.2d 513, 702 N.Y.S.2d 360 (N.Y.App.Div.2000)("Before specific performance of a contract for the sale of real property may be granted, a plaintiff must demonstrate that it was ready, willing, and able to perform its obligations under the contract to purchase, regardless of any alleged anticipatory breach by the defendants."); *Ross Bicycles, Inc. v. Citibank, N.A.*, 200 A.D.2d 379, 606 N.Y.S.2d 192, 193 (N.Y.App.Div.1994)("Ross Bicycles, to establish damages, must show that, but for Citibank's wrongful repudiation, it would have been ready, willing and able to fulfill its obligations under the contract.").

In short, the statement of the law in *American List* cited by 360networks is one honored in the breach, and does not accurately reflect the law. Consequently, 360networks had to show that it was ready, willing and able to order capacity at the time of the ANC Sale in order to sustain its proof of claim. It failed to carry that burden for the reasons discussed directly below.

## B. 360networks' Proof

360networks demonstrated at trial that it was financially capable of performing, and no legal impediments prevented its performance. It had prepaid for the telecommunications capacity, and Asia Global was responsible for the operating and maintenance costs during the 15 year IRU. The only cost that 360networks might have to bear, aside from the possible exercise of its portability rights, was employing salesmen to sell the capacity. There was no credible evidence that this possible cost would have any effect on its ability to perform.

360networks failed, however, to show that it was ready and willing to perform but for Asia Global's breach.[12] There was no proof that it held the periodic planning meetings with GC Bandwidth (or Asia Global) called for under the Master Agreement. It never ordered capacity during the first 22 months of the 24–month window. Moreover, its general practice was to seek out possible buyers before placing an order, and its efforts were unsuccessful. On only one occasion did it contemplate ordering capacity without a back-up cus-

---

**12.** Most of the reported decisions, including those cited by 360networks, center on the non-repudiating party's "ability" to perform; its intent is not at issue. *See Décor by Nikkei Int'l, Inc. v. Federal Republic of Nigeria*, 497 F.Supp. 893, 908–10 (S.D.N.Y.1980)(discussing sellers' ability to supply cement); *Sosa v. Acevedo*, 40 A.D.3d 268, 834 N.Y.S.2d 189, 189–90 (N.Y.App.Div.2007)(purchaser demonstrated ability and willingness to consummate sale contract by transferring the necessary funds into his attorney's escrow account and failing to pay only because the seller ignored his request for payment instructions); *Yitzhaki v. Sztaberek*, 38 A.D.3d 535, 831 N.Y.S.2d 267, 269 (N.Y.App.Div.2007)(plaintiff buyer's submission of two mortgages after the deadline established under the mortgage contingency clause did not bar specific performance); *McCabe v. Witteveen*, 34 A.D.3d 652, 825 N.Y.S.2d 499, 501 (N.Y.App.Div.2006)(plaintiff buyer was entitled to specific performance under contract setting deadline for an approval process, where buyer exercised his contractual right to extend the deadline, but the seller cancelled the contract); *Ross Bicycles, Inc. v. Citibank, N.A.*, 161 Misc.2d 351, 613 N.Y.S.2d 538, 539 (N.Y.Sup.Ct.1994)(plaintiff showed that it would have been able to comply with its obligations and tender letters of credit to the defendant). Although such cases sometimes equate the ready, willing and able requirement with the ability to perform, readiness and willingness, or intent to perform, is a separate requirement.

tomer. That occurred when it submitted a letter of intent in response to an Asia Global promotion. Rightly or wrongly, Asia Global advised 360networks that it could not use the Asia Commitment to buy capacity under the promotion, and 360networks did not place the order.

The evidence also demonstrated that 360networks never developed a plan *to* take down and warehouse any unused capacity at the end of the 24 months. 360networks' witnesses were repeatedly asked at trial whether 360networks had made a decision, formed a plan or engaged in discussions to order some or all of the Asia Commitment, even without a customer, if the Asia Commitment was about to expire. The 360networks witnesses uniformly admitted that no such decision or plan was ever made or discussed. (*See* Tr. (7/26) at 172–73(Gill)("I was not personally involved in that discussion"); Tr. (7/27) at 72–73 (Byrd)(no business plan to take down and inventory the capacity in the absence of customers); 131 (Mueller)(no plans to take down and then try to market the capacity).) At trial, these same witnesses nevertheless testified that 360networks would have ordered and warehoused the capacity under those circumstances. Their testimony was pure speculation, based on the notion that ordering the capacity did not cost 360networks anything, so why not do it.[13] One would think that if that was the plan, someone would have mentioned it or

written about it during the 22–months that the Asia Commitment was open. No one did, although they freely discussed other options. And if it was never planned or discussed, one wonders who would have executed the plan at the deadline.

The most compelling evidence of the lack of intent to order capacity was the utter failure to disclose the Asia Commitment in 360networks' Canadian bankruptcy proceeding. 360networks' former Chief Operating Officer, Jimmy Byrd, testified that in January 2003 (two months after emerging from bankruptcy), the company valued the Asia Commitment at $100 million. (Tr. (7/27) at 24–25.) This exceeded the amount of cash in the company, and was a material asset. Yet 360networks failed to mention the Asia Commitment or any plan to sell or warehouse the Asian capacity in the information circular it sent to its Canadian creditors in connection with the solicitation of their votes. (*See* TX DI.)

After the trial, 360networks' counsel wrote to the Court, offering an explanation for the omission. (Letter from Jeanne M. Luboja, Esq. to the Court, dated Aug. 28, 2007)(ECF Doc. # 909) According to the letter, the CCAA, (R.S.C.1985, c. C–36), which governed 360networks' Canadian bankruptcy, did not require the disclosure. The argument, however, is unconvincing. Unlike the United States Bankruptcy Code, the CCAA is a very brief statute

---

**13.** 360networks implied that it maintained a business practice of inventorying capacity for later resale. Prior to exiting bankruptcy, in November 2002, 360networks sold its undersea fiber-optic cable connecting Halifax, Nova Scotia with Southport, England (the "Hibernia Cable") to Columbia Ventures Corporation ("Columbia Ventures"). (*See* Tr. (7/27) at 92–93, 135–36; CX 256.) As a condition of the sale, which closed in March 2003, 360networks retained a 15–year IRU for a 10 Gb/s wavelength on the Hibernia Cable (the "Hibernia IRU") at no cost. (*See* Tr. (7/27) at 92–93, 135–37; CX 256.) 360networks contends that its actions with respect to the Hibernia IRU demonstrate that it "had (and has) a business practice of keeping valuable non-core assets in inventory, especially when it cost nothing to do so." (360 Br. at ¶ 15.) This one instance did not show a general business practice. In fact, aside from Hibernia, 360networks "by and large ... let go" of its international assets, including, apparently, its interests in a cable between New Jersey and Brazil. (*See* Tr. (7/27) at 91–92.)

with little detail. Canadian judges have filled in the gaps in legislation through case law and the exercise of judicial discretion, making a CCAA proceeding similar in many respects to a United States chapter 11. SUSAN M. GRUNDY, ET AL., THE INSOLVENCY LAWS OF CANADA 84 (Howard S. Beltzer et al., eds. Juris Press 2006).

A CCAA plan, in this regard, must be approved by a majority of creditors in each class holding at least 66⅔% of the total value of the claims in the class. *Id.* at 118. When the plan is sent to the creditors, it is usually accompanied by an information circular or disclosure statement. *Id.* The information circular includes detailed information describing the debtor's financial position and the terms of the plan, and compares the terms of the plan to the alternatives. *Id.* "A CCAA debtor is required to make full disclosure of all relevant information to its creditors." *Id.* at 119.

360networks was required to disclose all relevant and material information to its creditors. The information circular that it sent to solicit their votes did not mention the Asia Commitment or a plan to market capacity in Asia. The failure to mention the Asia Commitment—which Byrd valued at $100 million—implied that its value, if any, was immaterial and played no part in 360networks' future plans.

Although the Court need not speculate on why 360networks was unwilling to order and warehouse the capacity in the hope of selling it in the future, some reasons come to mind. The IRUs were not saleable, and declining in value. 360networks' portability rights allowed 360networks to switch previously designated routes for two years, but 360networks had to pay a redesignation fee. These facts and its past lack of success may have led 360networks to decide not to divert its sales efforts from its North American core business.

Furthermore, 360networks had never gone out of pocket to acquire the capacity. The Asia Commitment was part of an IRU swap with Global Crossing in which neither ordered capacity from the other, and 360networks netted $50 million. Born as a swap, 360networks also sought to end it as a swap. It planned to offer the Asian capacity back to Global Crossing for $25 million to offset a $25 million obligation owed to Global Crossing. After the Settlement Agreement in October 2002, 360networks no longer needed the offset.

Whatever the reason, 360networks failed to prove that it intended to order the capacity prior to the end of the 24–month term, or that it would have done so but for Asia Global's anticipatory breach. In the end, its entire case rested on the strength of the inference that it would have ordered all of the capacity because it didn't cost anything. That inference was not strong enough to overcome the contrary evidence of lack of intent.

## CONCLUSION

360networks' claim is expunged. The foregoing constitutes the Court's findings of fact and conclusions of law. Settle order on notice.